UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ARIZONA BEVERAGES USA, LLC,

                        Plaintiff,

            - against -

HANOVER INSURANCE COMPANY,

                        Defendant.
------------------------------------------------------------X

FILED
CLERK
2:14 pm, Jul 17, 2023
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

MEMORANDUM
AND ORDER

Civil Action
No. 20-1537 (GRB)(LGD)

**GARY R. BROWN, United States District Judge**:

      Reportedly, Arizona Beverages sells more than $3 billion in drinks and related products every year.[1] In the absence of cashflow, that river of beverages would quickly run dry. This undeniable proposition helps resolve the pending motions for summary judgment in this business interruption coverage dispute.

      *Factual Background*

      The following facts, except where otherwise stated, are largely undisputed. Arizona Beverages USA, LLC ("Plaintiff"), one of the largest private companies in the nation,[2] maintained commercial insurance with one of the nation's oldest insurers, Hanover Insurance Company ("Defendant").[3] This dispute emanates from a policy that insured Plaintiff against certain losses and extra expenses it might incur as a result of a covered loss (the "Policy"). Docket Entry ("DE") 35-2 ¶ 3.

      As part of its business operations, Plaintiff entered into a credit agreement with JP Morgan Chase, N.A. ("Chase") wherein Chase provided a credit line for Plaintiff to maintain its cashflow

---

[1] *Arizona Beverage*, FORBES, https://www.forbes.com/companies/arizona-beverage/?sh=53fb0ff64574 (last visited July 12, 2023).
[2] *Id.*
[3] *Our history*, THE HANOVER INSURANCE GROUP, https://www.hanover.com/why-hanover/about-our-company/our-history (last visited July 12, 2023).

1

(the "Credit Agreement"). *Id.* ¶ 7. Pursuant to the Credit Agreement, Plaintiff is required to undertake an independent audit of its financial position every year, to be completed by May 31 of the following year. *Id.* ¶ 8. The May 31 deadline could be extended by purchasing additional time periods. *See id.* ¶ 30. Failure to complete the audit would render Plaintiff in default of the Credit Agreement, which would allow Chase to demand immediate repayment. *Id.* ¶ 9. Such a repayment demand would likely require liquidation of Plaintiff. *Id.* ¶ 10.

On October 29, 2017, Plaintiff suffered a power surge at its corporate headquarters, which damaged multiple disc drives, resulting in a catastrophic failure of Plaintiff's account operating system (the "Loss"). *Id.* ¶ 12. Plaintiff was unable to access its computer software and applications, including account balances, receivables, inventory, and order information. *Id.* ¶¶ 19-20. Plaintiff acted swiftly to repair the hardware and restore the backup data, and, by January 8, 2018, had regained software functionality as to its present period operations. *Id.* ¶ 13; DE 32-1 ¶ 19. The data and functions for 2016 and 2017, however, were never recovered, which included the data used by Plaintiff's auditor to complete its annual audit. DE 35-2 ¶¶ 20, 24.

Days after the Loss, Plaintiff's auditor, Deloitte and Touche LLP ("Deloitte"), contacted Plaintiff to commence its annual audit for 2017 (the "Audit"). *Id.* ¶ 14. At the time, Deloitte was unaware of the Loss and provided Plaintiff with an engagement letter, quoting Plaintiff $265,000 to complete the Audit. *Id.* ¶ 16; DE 22 ¶ 14, Ex. A. A few days later, Plaintiff's Executive Vice President, Patricia Catalina, contacted Deloitte to inform them of the Loss and Plaintiff's efforts to recover the relevant lost data. DE 35-2 ¶ 16. But since Plaintiff was unable to recover the data typically used by Deloitte to evaluate and test Plaintiff's financial statements for the third quarter, Deloitte had to dramatically revise its normal audit procedures in accordance with accepted accounting principles. *Id*. ¶ 23, Ex. G at 28-32, 96:11 ("[W]e had to change everything.").

As a result, Plaintiff incurred substantial additional costs in completing the Audit. The revised audit procedures required Deloitte to conduct an additional 2,200 hours of work above the original quote. *Id.* ¶ 23, Ex. G at 71:21-72:1. Deloitte billed Plaintiff $450,000 for these additional efforts after negotiations. *Id.* ¶ 24.[4] In utilizing the revised procedures, Plaintiff's employees worked overtime to assist Deloitte, incurring $86,455 in overtime wages. *Id.* ¶ 30. And since the Audit could not be completed by the May 31 deadline set forth in the Credit Agreement, Plaintiff had to purchase deadline extensions with Chase to complete the Audit at a cost of $16,188.25. *Id.*

As to the Loss, Defendant reimbursed Plaintiff $250,000, the sublimit for data restoration under the Policy. *Id.* ¶ 29. Plaintiff sought coverage and reimbursement from Defendant under the Policy for the additional audit expenses, totaling $552,573.25 (the "Audit Expenses"). *Id.* ¶ 28. Concerning the Audit Expenses, Plaintiff sought coverage pursuant to the "extra expense" provisions of the Policy, which state, in pertinent part:

> **EXTRA EXPENSE**
>
> "We" cover only the extra expenses that are necessary during the "restoration period" that "you" would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a covered peril.
>
> "We" cover any extra expense to avoid or reduce the interruption of "business" and continue operating at a "covered location", replacement location, or a temporary location. This includes expenses to relocate and costs to outfit and operate a replacement or temporary location.

*Id.* ¶ 6; DE 32-2 at 100. The Policy defines "restoration period," as relevant here:

> "Restoration period" means:
>
> 1. The time it should reasonably take to resume "your" "business" to a similar level of service beginning . . .

---

[4] Defendant engaged with two forensic accountants, who both determined that Deloitte's additional audit fee of $590,000 was reasonable. DE 35-2 ¶ 47. Deloitte originally quoted Plaintiff $1,500,000 for the Audit. *Id.* ¶ 24.

3

> b. for extra expenses, immediately following the direct physical loss of or damage to property at a "covered location" that is caused by a covered peril.
>
> The "restoration period" ends on the date the property should be rebuilt, repaired, or replaced or the date business is resumed at a new permanent location

*Id.* at 106. The Policy defines "business" as "the usual business operations occurring at 'covered locations.'" *Id.* at 66. Defendant took inconsistent positions regarding coverage, but ultimately denied Plaintiff's claim for reimbursement for the Audit Expenses.

Around October 12, 2018, Defendant's adjuster, Nicholas Tenan, emailed Plaintiff's insurance broker, informing him that "[t]he increased costs [of the Audit] will be included in the loss of business income, thus afforded coverage under the business income coverage and extra expense coverage embedded in the Equipment Breakdown. You can let them know it will be included in the claim." *Id.* ¶¶ 27, 34. But at his deposition, Tenan testified that this email was "worded incorrectly" due to "self-duress" and "pressure" that he put on himself in not providing an update to his client sooner and that he actually "made no formal decision" on Plaintiff's claim at the time. DE 36-1 ¶ 34.

Soon thereafter, Plaintiff's claim was reassigned to Joseph Tamres, who testified that if the Audit Expenses were incurred to prevent a loss of income during the period of restoration, then it would be covered under the Policy. *Id.* ¶¶ 35, 43; DE 35-2 ¶ 43. And, on February 6, 2019, in the context of whether an exclusion under the Policy applied, Mark Cullen, another adjuster for Defendant, told Tamres that he believed that the Audit Expenses should be covered under the Policy. DE 35-2 ¶ 47, Ex. J at 71:17-72:2.

But, on March 6, 2019, Defendant issued a payment notice and summary to Plaintiff, which provided the remaining reimbursements from the Loss but denied reimbursement for the Audit

4

Expenses. DE 35-2 ¶ 51, Ex. O at 2. Specifically, the notice stated that "any and all of the additional expenses the insured has incurred due to the loss of data totaling $957,573.03 was the direct result of the data restoration event and exceeds the policy limit of $250,000." *Id.* In response, Plaintiff's broker informed Defendant that "[h]ad the audit financials not been presented to the [Plaintiff's] bank by the deadline, the bank would have called the loan. The insured would have to start liquidating assets and sell inventory below to repay the loan. These additional expenses prevented a significant business income loss." *Id.* ¶ 55. Nevertheless, Defendant denied coverage as to the Audit Expenses. *Id.* ¶ 56.

This suit followed.

*Procedural History*

Plaintiff commenced this action against Defendant on October 28, 2019, in Nassau County Supreme Court, alleging breach of contract. DE 1-2 at 8. Defendant subsequently removed the suit to this Court on March 25, 2020. DE 1. After the close of discovery, the parties both requested a pre-motion conference seeking leave to file motions for partial summary judgment. On March 21, 2022, the Court held a pre-motion conference and set a briefing schedule. This opinion follows.

**Discussion**

There are two issues at the core of this case: (1) whether Plaintiff's annual audit is part of its "usual business operations," and, if so, (2) whether the Audit Expenses were incurred during the "restoration period." Based on the undisputed facts, both questions are answered in the affirmative.

*Standard of Review*

This motion for summary judgment is decided under the oft-repeated and well understood standard for review of such matters, as discussed in *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F.

5

Supp. 3d 198, 211 (E.D.N.Y. 2015), *aff'd sub nom. Bartels v. Schwarz*, 643 Fed. App'x. 54 (2d Cir. 2016), which discussion is incorporated by reference herein.

*Principles of Insurance Policy Interpretation*

Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 220 (2d Cir. 2021) (quoting *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006)). As such, New York law treats an insurance policy as a contract and construes it in accordance with general contract principles. *Scottsdale Ins. Co. v. Long Beach Polar Bear Club City of Long Beach*, No. 20-CV-3026 (JMA)(AYS), 2022 WL 1748618, at *3 (E.D.N.Y. Mar. 18, 2022) (citing *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010)). "The policy must . . . be construed in favor of the insured, and ambiguities, if any, are to be resolved in the insured's favor and against the insurer." *10012 Holdings, Inc.*, 21 F.4th at 220 (quoting *U.S. Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 232 (1986)). "But '[w]here the provisions of [a] policy are clear and unambiguous, they must be given their plain and ordinary meaning, and courts should refrain from rewriting the agreement.'" *Id.* (quoting *U.S. Fid. & Guar. Co.*, 67 N.Y.2d at 232).

Thus, "the initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). A court will find language in an insurance contract ambiguous if "reasonable minds could differ as to its meaning." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010) (quoting *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d

6


Cir. 1998)). "In other words, ambiguity is present where the contractual language at issue is 'reasonably susceptible to more than one reading.'" *Id.* (citation omitted).

Here, a plain reading of the Policy and relevant provisions reveal no such ambiguity, and the parties agree. *See* DE 35-2 at 9; DE 32-16 at 15. The Policy covers "extra expenses that are necessary during the 'restoration period' that [Plaintiff] would not have incurred if there had been no [Loss]," including "any extra expense to avoid or reduce the interruption of 'business' and continue operating at [Plaintiff's headquarters]." DE 32-2 at 100. The Policy defines "restoration period" as beginning "immediately following" the Loss and ending "on the date the property should be rebuilt, repaired, or replaced," while defining "business" as "usual business operations occurring at [Plaintiff's headquarters]." *Id.* at 66, 106. These provisions suggest that if the Audit was part of Plaintiff's usual business operations and the Audit Expenses were incurred during the restoration period, then the Policy provides coverage. Therefore, the Court finds that the relevant Policy provisions are unambiguous and will give them their "plain and ordinary meaning." *See 10012 Holdings, Inc.*, 21 F.4th at 220.

*"Usual Business Operations"*

Whether the Audit Expenses and the resulting provision of continued cashflow for operations were part of Plaintiff's "usual business operations" is fairly self-evident. From the perspective of any business—let alone a multi-billion, international company such as Plaintiff— the plain and ordinary meaning of "usual business operations" refers to activities undertaken on a regular basis that are essential to the company's continued existence. *See Fishbowl Sols., Inc. v. Hanover Ins. Co.*, No. 21-CV-0794 (SRN)(DJF), 2022 WL 16699749, at *6 (D. Minn. Nov. 3, 2022) (holding that a company's "usual and regular business activities" is broad and covers "all business activities performed with a certain frequency and consistency" and "makes no distinction

based on the type of business activity"). Such activities may take on many forms, including activities to increase profits, expand brand recognition, and monitor staffing needs. *See, e.g.*, *New England Sys., Inc. v. Citizens Ins. Co. of Am.*, No. 20-CV-01743 (SVN), 2022 WL 17585966, at *8 (D. Conn. Dec. 12, 2022) (finding that a plaintiff company's "business operations may have been impaired under the Policy if Plaintiff was unable to function at full capacity because it needed to dedicate its employees to client remediation work as a result of the data breach."). It may also include managing financial obligations such as maintaining cashflow, servicing debt, and filing tax returns. *See Vissa v. Williamson*, 276 A.D. 662, 664 (App. Div. 1950), *aff'd,* 302 N.Y. 750 (1951) ("[B]usiness operations . . . may fairly be said to embrace many activities.").

Thus, Plaintiff's annual audit falls squarely within its usual business operations. Ordinarily, Plaintiff's audit procedure begins in September or October of the year that is being audited. DE 35-2 ¶ 11. Plaintiff provides the auditor with preliminary financial information for the third quarter along with year-to-date numbers and inventory levels so the auditor can assess their audit approach. *Id.* Plaintiff also prepares for physical observations of its inventory by the auditor, which begins around November of the year being audited. *Id.* And in anticipation of the physical inspections, Plaintiff provides the auditor with additional financial information and interim balances of accounts receivable so that the auditor can determine how many selections it would make for confirmation related balances. *Id.*

To maintain cashflow and continue the day-to-day operations of the company, Plaintiff relies on its Credit Agreement with Chase. As such, Plaintiff is bound to the terms and conditions of that agreement, which includes a requirement that Plaintiff complete an annual audit. Failure to complete the annual audit would render Plaintiff in default, thereby giving Chase the opportunity to demand immediate repayment of the full outstanding balance, potentially requiring liquidation

8

of Plaintiff's inventory and receivables, and the company shuttered. Thus, completing its annual audit represents a vital part of Plaintiff's operations, ranking alongside the importation of tea leaves.[5]

Defendant argues that Plaintiff is in the business of "producing, marketing, selling and distributing beverage products," not auditing. DE 32-16 at 1; DE 34 at 7. But Defendant construes the Policy too narrowly and fails to recognize that Plaintiff's operations involve more than its end products. Indeed, for Plaintiff's products to end up on the shelves of retail stores, there are countless other aspects of Plaintiff's company that must operate simultaneously that may not be directly related to production but are indirectly vital to it. The continued receipt of operating funds from Chase is one of them. To be sure, had Defendant intended to limit the definition of "business" and "usual business operations" to solely activities directly arising out of "producing, marketing, selling and distributing beverage products," Defendant could have expressly drafted that language in the Policy. *See Fishbowl Sols., Inc.*, 2022 WL 16699749, at *5 ("If Hanover wanted to restrict 'business operations' to include only the 'income-generating' subset of Fishbowl's 'usual and regular business activities,' it had the responsibility as drafter to write the governing contractual definition accordingly."); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. TransCanada Energy USA, Inc.*, 52 Misc. 3d 455, 461 (N.Y. Sup. Ct. 2016), *aff'd sub nom. Nat'l Union Fire Ins. Co. v. TransCanada Energy USA, Inc.*, 153 A.D.3d 1153 (1st Dep't 2017) ("The best evidence of what the parties to an agreement intended is the language of the agreement itself, especially where, as here, the parties to the insurance policy were sophisticated entities.") (citation omitted).

Additionally, Defendant's argument that Plaintiff's annual audit is completed by an independent entity and therefore constitutes something other than Plaintiff's operations fails to

---

[5] *FAQS*, ARIZONA BEVERAGES USA, https://drinkarizona.com/pages/faqs ("Our tea comes from all main tea-growing countries such as China and India.") (last accessed July 12, 2023).

9

carry the day. Indeed, Plaintiff's audit *must* be completed by an independent entity. DE 35-2 ¶ 25. Moreover, while Plaintiff retains Deloitte annually to conduct the audit, its employees work closely with Deloitte to ensure its proper completion through diligent and accurate record keeping, precise inventory counts and accounts receivable, and other assistance, sometimes requiring Plaintiff's internal employees to work overtime. Thus, it is ultimately irrelevant whether Deloitte is "independent" of Plaintiff as Plaintiff devotes significant time and resources to completing its annual audit.

Therefore, the Court finds that Plaintiff's annual audit is part of its "usual business operations" as defined by the Policy.

*"Restoration Period"*

The Policy defines "restoration period" as the "time it should reasonably take to resume [Plaintiff's] 'business' to a similar level of service." DE 32-2 at 106. It further explains that for "extra expenses, [the restoration period commences] immediately following the [Loss]." *Id.* The Policy provides two alternative end dates. First is the "date the property should be rebuilt, repaired, or replaced." *Id.* Alternatively, the period ends on the "date business is resumed at a new permanent location." *Id.* Here, the "restoration period" began on October 29, 2017, the date of the Loss. The parties diverge, however, as to the appropriate end date. Defendant contends that the "restoration period" ended on January 8, 2018, when Plaintiff regained software functionality for its present operations but the historical data for 2016 and 2017 had not been restored. DE 36-1 at 12. Plaintiff argues that since the relevant Audit data proved unrecoverable, the property was *never* "rebuilt, repaired, or replaced." DE 35-1 at 10. And because it was impossible to restore the lost data, the proper end date of the restoration period should be measured by the length of time it took Deloitte to work around the missing data from the Loss. *Id.* Thus, Plaintiff concludes that

10

the "restoration period" continued until October 24, 2018, when Deloitte completed the Audit. *Id.*; DE 35-8 at 146:20-22. This argument proves more persuasive.

The Policy clearly anticipates alternative means of restoration in circumstances in which property proves unrecoverable. One example is the express term provision that extends the "restoration period" until "the date business is resumed at a new permanent location." DE 32-2 at 106. Thus, as here, the impossibility of restoration does not extend the period indefinitely, rather the Policy expressly anticipates alternative means of a "work-around." This concept is buttressed by the well-settled proposition that insurance policies are to be construed "in light of 'common speech' and the reasonable expectations of a businessperson." *See U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L.*, 823 F.3d 146, 152 (2d Cir. 2016) (citations omitted).

Deloitte's enhanced Audit procedures constituted a reasonable form of "repairing, replacing, or rebuilding" the lost data to satisfy acceptable accounting principles. Deloitte had to analyze additional types and forms of data to form its opinion, including, for example, conducting a proof of cash from the transactions that went through Plaintiff's bank accounts, which meant every transaction was identified, documented, and assigned a financial statement assertion. DE 35-8 at 92:14-20; *see also id.* 131:19-29 ("I now have to convert cash basis accounting to accrual basis accounting for this Audit Opinion."); DE 35-10 at 30-32 (discussing proposing to create a new entire manual ledger since Plaintiff could not provide general ledger transactional details). Indeed, Deloitte could only audit certain sections of Plaintiff's financial statements for which it had "concrete support." DE 35-8 at 135:6-7; *id.* at 113–14 (discussing importance of disaggregating Plaintiff's inventory balances so that each part had a certain level of detail and supporting documentation behind it for validation). "Everything had to be reviewed, second

11

partner reviewed, [and] national office[6] reviewed by the partner who signed off on the plan for each one of those items . . . . Those approaches were being developed as information was being provided." *Id.* at 146:11-17.  Thus, while the missing 2017 data was never recovered, Deloitte created a functional simulacrum of the lost data throughout its modified Audit process, ultimately finalizing its repair on October 24, 2018, when it completed the Audit.

Even accepting Defendant's position that the use of "should be" in the provision means the theoretical time—not the actual time—it should take to repair, rebuild, or replace the property, the result remains the same. *See* DE 32-16 at 14.  There is no evidence that Plaintiff or Deloitte were dilatory in replicating the lost data.  In fact, the evidence is to the contrary.  Plaintiff was particularly motivated to complete the Audit as it was critical to its ongoing loan agreement with Chase and Plaintiff had already missed the May 31 deadline, incurring attorneys' fees and costs to extend that deadline.  Meanwhile, Deloitte had worked diligently to complete the Audit using its modified procedures. *See, e.g.*, DE 35-8 at 108:22-25 (acknowledging correspondence regarding the Audit taken place around 11:00 p.m. on a Sunday night); *id.* at 108:1 ("We never stopped working."); *id.* at 231:19-20 ("[Deloitte's] additional work concluded upon their issuance of their [Audit] Opinion.").  Therefore, given the plain and ordinary meaning of the Policy and the reasonable expectations of the parties, the "restoration period" began on October 29, 2017, the date of Loss, and ended on October 24, 2018, the date of the Audit's completion.

For the avoidance of doubt, to the extent that the definition of "restoration period" is ambiguous, Plaintiff, as the insured, still prevails.  Where a contract is ambiguous, "New York follows the well-established *contra proferentem* principle which requires that equivocal contract provisions are generally to be construed against the drafter." *Judd Burstein, P.C. v. Long*, 180 F.

---

[6] Deloitte's national office "manages the firm's structure and consults on problematic, very high-level accounting questions of individual teams." DE 35-8 at 231:3-6.

12

Supp. 3d 308, 312 (S.D.N.Y. 2016) (quoting *McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121, 124 (2d Cir. 2002)).  Defendant must demonstrate not only that its interpretation is reasonable but that it is the *only* fair interpretation.  *See City of New York v. Evanston Ins. Co.*, 39 A.D.3d 153, 156 (2d Dep't 2007) (citation omitted) (emphasis added).

Defendant's view, that the restoration period ended on January 8, 2018, when Plaintiff regained software functionality, seems anything but a fair and reasonable interpretation of the Policy.  The Policy defines the "restoration period" as "[t]he time it should reasonably take to resume 'your' [usual business operations] to a similar level of service . . . [ending] on the date the property should be rebuilt, repaired, or replaced . . . ."  DE 32-2 at 106.  The Loss caused a catastrophic disruption of Plaintiff's software and operating systems.  While Plaintiff restored some functionality, the relevant audit data for 2017 was never recovered, thereby preventing Deloitte from discharging its responsibilities.  As such, Plaintiff was unable to service its debt obligations until Deloitte developed and completed its modified procedures.  Thus, Plaintiff's usual business operations were not resumed to a similar level of service until October 24, 2018, when the Audit was completed.  Such a reading of the Policy is a fair and reasonable one.  Indeed, one "purpose of the business interruption insurance is to . . . compensate an insured for losses stemming from an interruption of normal business operations . . . by placing the insured in the position that it would have occupied if there had been no interruption."  *Nat'l Union Fire*, 52 Misc. 3d 455 at 466 (cleaned up).

Turning to the remaining relevant provisions of the Policy, extra expenses will be covered if they are "necessary during the 'restoration period" that Plaintiff "would not have incurred if there had been no [Loss]."  DE 32-2 at 100.  The Policy also covers extra expenses incurred to "avoid or reduce the interruption of 'business' and continue operating at [Plaintiff's

13

headquarters]." *Id.* Given their plain and ordinary meaning, these provisions further support coverage of the extra expenses Plaintiff incurred to avoid the interruption of its usual business operations but for the Loss.

Here, the Audit Expenses fall squarely within the "extra expense" provisions of the Policy. First, the Audit Expenses were incurred to avoid the interruption of its usual business operations. As discussed above, Plaintiff's annual audit is included in its usual business operations and the Audit Expenses were incurred to prevent a grave financial threat, to wit: a potential liquidation of the company, thus "avoid[ing] the interruption" of Plaintiff's business. And second, but for the Loss, Plaintiff would not have incurred the Audit Expenses. Indeed, the sole cause for these additional expenses was because the financial records necessary to complete the Audit were destroyed in the Loss.

Therefore, the Audit Expenses are covered under the Policy, and Defendant's remaining arguments are unavailing as contrary to the express terms of the Policy and applicable case law.

*Conclusion*

For the reasons set forth above, Defendant's motion for summary judgment is DENIED, and Plaintiff's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to enter judgment for Plaintiff and close the case.

**SO ORDERED.**

Dated: Central Islip, New York
      July 17, 2023

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge